**BUTLER, ESTATE OF, In Re**

Ohio Appeals, 2nd Dist, Franklin Co.

No. 2979.  Decided July 20, 1939.

Vernon W. Wenger, Columbus; James I. Boulger, Columbus, for Lewis C. Freeman, Admr. with the will annexed.

Charles S. Druggan, Columbus; J. Paul McNamara, Columbus; Griffith & Griffith, Columbus; Watson, Davis & Joseph, Columbus; Joseph G. Ehrlich, Cleveland, for exceptors.

## OPINION

By BARNES, J.

The above entitled cause is now being determined as an error proceeding by reason of Lewis C. Freeman's, administrator with the will annexed, appeal on questions of law.

The cause originated in the Probate Court of Franklin County, Ohio, on exceptions to the first account duly filed by devisees and legatees of Henry V. Butler, deceased.

Henry V. Butler died testate on February 29, 1936. The decedent had never been married; was approximately seventy-five years of age and died very suddenly by reason of an injury sustained in a fall the day previous to his death.

The decedent left a duly executed will, which was probated in a few days

following his death. Edward Butler, a brother of the decedent, was named as executor in the will but failed to qualify. The decedent at the time of his fall and the injury resulting therefrom was at the home of Park L. Roush. Following the injury, Mr. Butler was taken to the hospital and Grover C. Brown and Frederick W. Freeman were notified, but neither arrived at the hospital until after Mr. Butler's death.

Mr. Grover C. Brown had been attorney for Mr. Butler for a great number of years. Frederick W. Freeman, for a great number of years, had been a stock broker, during which time Mr. Butler had been a client.

Grover C. Brown had drafted the will for Mr. Butler and thereby knew that his brother, Edward Butler, was named as executor. Within a few days following Mr. Butler's death and before administration papers had been taken out, Mr. Grover C. Brown and Mr. Frederick W. Freeman went to the home of Mr. and Mrs. Park L. Roush and then and there gathered together all the papers and personal effects of Mr. Butler and took same to the office of Mr. Brown. Within a day or two thereafter, Mr. Brown and Mr. Freeman appeared at the home of Edward Butler, having with them two blank documents from the Probate Court, one of which was prepared and executed by Mr. Edward Butler, declining the administration of the estate, and the other was prepared and signed recommending Mr. Frederick W. Freeman as administrator, w.w.a. Mr. Edward Butler, because of his advanced age and infirmity, probably was not qualified to act as executor. No other devisee or legatee resided in Franklin County. One of the devisees, who was under guardianship, resided in Cleveland, a number of others in Portsmouth and the remaining devisees and legatees resided outside of the state of Ohio.

Very shortly after securing the executed documents from Mr. Edward Butler, Grover C. Brown and Frederick W. Freeman appeared at the office of the Probate Court for the purpose of preparing the necessary papers and securing the appointment of the administrator with the will annexed.

Mr. Frederick W. Freeman, by reason of the fact that he had a claim against the estate, declined the appointment and it was then and there suggested that a brother and employee of Mr. Freeman, Lewis C. Freeman, be appointed as such fiduciary, which was accordingly done.

Mr. Lewis C. Freeman was practically blind and thereby was compelled to call to his aid others to assist him in the administration of said estate, particularly clerical work. Mr. Lewis C. Freeman promptly gave bond and qualified as such administrator w.w.a. He selected Grover C. Brown as his attorney and had his selection confirmed by action of the Probate Court.

The estate of Henry V. Butler, according to the inventory, approximated $325,000.00. On July 29, 1936, the administrator filed a schedule of debts which contained an allowed claim of Grover C. Brown totaling $66,027.00, and a claim of Frederick W. Freeman in the sum of $40,775.00 with a credit of $19,367.01, leaving a balance of $21,407.99.

Following the filing of the schedule of debts, the Probate Court, in conformity with §10509-119 GC, set a day for hearing, caused publication of notice to be made and at the expiration of the stautory period affirmed the schedule. No exceptions or objections were filed to the schedule of debts. Within a few days following the affirmation, the administrator paid to Grover C. Brown and Frederick W. Freeman, the total amount of their respective claims.

On February 17, 1937, the administrator filed his first account. Recapitulation is as follows:

Total amount chargeable ____ $184,892.12
Total amount credited _____ 165,674.14
Balance due said estate _____ $ 19,217.98

We are not sure that this first account takes into consideration the total assets although we assume that all claims and credits were listed and to-

tal the amount set out in the recapi-tulation. We are lead to this conclu-sion from the fact that the total amount charged is much less than the inventory.

In April and May following, the lega-tees and devisees, some separately and others collectively, filed exceptions to the administrator's first account and also motions for the removal of Lewis C. Freeman the administrator and Gro-ver C. Brown the attorney.

These exceptions vary somewhat in their statements, but all in substance claim that the administrator unlawful-ly, fraudulently and contrary to the rights of the legatees conspired with his attorney, Grover C. Brown, and Frederick W. Freeman in the presenta-tion, allowance and payment of large, illegal and unauthorized claims in the total sum of $65,661.54 to Brown and the sum of $21,681.99, plus an illegal credit of $19,367.01 to his brother, Fred-erick W. Freeman.

In addition, a citation was issued to the administrator to appear before the Probate Court for examination. Hear-ing on the citation started April 23, 1937. Before the termination of this hearing, the Court concluded that the pending exceptions to the account and the applications for removal of the ad-ministrator and his attorney, Grover C. Brown, were so involved and would take so much time to hear the same, that he decided to appoint a master com-missioner to take the evidence and thereafter make his report on law and facts.

Honorable Lyle M. Sandles was ap-pointed special master commissioner on April 23, 1937. Many preliminary ques-tions were raised and determined, so that the hearing before the master did not start until May 19, 1937. The de-termination of the preliminary ques-tions, taking of evidence and the re-port of the master commissioner con-sumed fifty-seven days. The tran-scribed record contains twenty-eight hundred pages and in addition thereto two separately bound volumes of ex-hibits.

During the taking of the evidence and before its completion, Lewis C. Free-man resigned as administrator, said date being September 22, 1937, which resignation was accepted by the Probate Court and J. Paul McNamara was ap-pointed administrator d.b.n.w.w.a. of the Henry V. Butler estate.

By reason of such resignation and its acceptance, no further question was raised on the application for removal. Any evidence relating solely to the ques-tion of the removal of Lewis C. Free-man as administrator and Grover C. Brown as attorney would be properly eliminated and not considered on the question of exceptions to the account. Much of the evidence on the issue of removal would be pertinent on the is-sue of exceptions to the account and, therefore, would properly remain for consideration by the master.

Grover C. Brown's account, as sub-mitted to the administrator on June 23, 1936, reads as follows:

"Grover C. Brown, being first duly sworn, deposes and says that he is an attorney at law under the laws of the state of Ohio, and has practiced his profession in the city of Columbus since the 13th day of September, 1913.

"That he became acquainted with the late Henry V. Butler in the year 1908, and that during the year 1912 the said Henry V. Butler was absent from the state of Ohio part of his time and made various trips, including a trip to Cuba, Central America, and that during his absence from home this affiant looked after all of his properties and business, and that in 1913 said Henry V. Butler was absent from Ohio a great part of the year and sojourned in Europe, and that during his absence the said Grover C. Brown managed and looked after all his properties and business.

"That the said Henry V. Butler agreed to pay the said Grover C. Brown a rea-sonable fee for said services hereinbe-fore set out.

"Affiant further says that in the fol-lowing year, 1913 he entered into an agreement with the said Henry V. But-ler whereby he was to help manage,

handle and control the properties and belongings of the said Henry V. Butler, to represent him as attorney at law in all matters where the services were necessary; to be prepared to go at all times to such places as the said Henry V. Butler would direct, and that the said Henry V. Butler agreed to pay for said services at a later date or by the provisions of a will whereby Grover C. Brown would receive fifty per cent of the estate of the said Henry V. Butler; that in 1928 an agreement in writing was entered into between the said Grover C. Brown and Henry V. Butler which agreement in substance is as follows:

" 'I hereby agree to pay to Grover C. Brown a reasonable fee for the services now rendered and to be rendered, and if anything should happen to me I want him to be well paid for all his services legal and otherwise.
Dated February 8th, 1928.'

"This affiant further says that from the first day of January, 1912, up to and including the 28th day of February, 1936, he spent about fifty per cent of his time rendering various forms of service, legal and otherwise to the said Henry V. Butler; that during nearly the entire time this affiant had at the disposal of the said Henry V. Butler a good running automobile and drove the said Henry V. Butler on an average of about 15,000 miles a year in and about the performance of his services to the said Henry V. Butler, and also the taking of monthly pleasure trips, including trips all over the United States, Florida, Texas, California, Iowa, Wisconsin, Michigan, Canada, the New England states, the eastern seaboard states; that the said Henry V. Butler spent about fifty per cent of his week-ends at the home of the said Grover C. Brown since 1912, and spent all his holidays at the said home of Grover C. Brown including New Years, Easter, 4th of July, Hallowe'en, Thanksgiving, Christmas, since 1912, to the time of his death.

"That the said Grover C. Brown aided in many ways for the comfort of the said Henry V. Butler, entertaining him and driving him on every occasion in which he asked for such services.

"The said Henry V. Butler used and occupied the office of Grover C. Brown during said time, used the telephone at any and all times he desired, called the said Grover C. Brown at his office and home daily.

"The said Grover C. Brown managed and platted the land of the said Henry V. Butler, made all abstracts, closed all deals for him, made and prepared all necessary papers and documents, furnished all the stamps and stationery necessary in Butler's business, paid for all transportation, took care of all legal papers, suits, both for and against the said Henry V. Butler, aided him in all his troubles and difficulties, legal or other matters.

"That said services began January, 1912, and ended February 28th, 1936, are of the reasonable value of $3000.00 per year, that no part of the same has been paid and that there is justly and truly due said sum.

"This affiant further says that he will accept as a complete settlement the sum of $100.00 per month with interest at 6% computed annually, if the same is paid to him without any delay or without any trouble.

"In witness whereof, the said Grover C. Brown has hereunto subscribed his name this 23rd day of June, 1936.
"(Signed)     Grover C. Brown.
"(Signed) G. N. Brown
"(Signed) E. S. Flanders.

"State of Ohio, Franklin County, ss:
"Personally appeared before me the above named Grover C. Brown who made oath that the facts stated and allegations set out in the foregoing proof of claim are true as he verily believes.
"J. E. Charles
"(Signed)     J. E. Charles
"Notary Public,
Franklin County, Ohio.

"The above claim of Grover C. Brown is hereby received and allowed this 23rd day of June, 1936.
"(Signed)     Lewis C. Freeman
"Administrator of the estate of
Henry V. Butler."

In the Schedule of Debts the claim of G. C. Brown appears as follows:

"54 G. C. Brown, Columbus, Ohio. On written agreement with Henry V. Butler, deceased, for services rendered and money expended $66027.00 Allowed"

The writing upon which Grover C. Brown bases his claim of a written contract is in the words and figures following:

"Feb. 8th, 1928

"I have this day received from Grover C. Brown, the following securities, to-wit:

Land Contract, Lenora Scroggs
Walter J. Shapter, note and mortgage
Geo. Dial Mtg. 170 feet S. Sullivant
Geo. Dial Mtg. 245 feet S. Sullivant
Agnes Bentz, Mtg. and note
Geo. Dial Mtg., Reserve A. and other property.
William Hetzer, Mtg. sought of Sullivant
Geo. Dial, Mtg. 170 feet S. Sullivant
William Hetzer, note $388.61 and $50.00   $120.00
$120.00 Geo. Dial notes, $1450.00, $375.00, Oct. 4, 1919. $800.00 Jan. 5th, 1920. $600.00 Nov 3rd, 1916, $550.00 Feb. 27, '19
$600.00 Dec. 2nd 1916, $375.00 Oct. 4, 1919, $600.00 Mar. 11, '38.
$600.00 Nov. 13, 1916. $231.95, 1922
Geo. Lechler, Mtg. Dec. 7th, 1925
Helen E Stout, Mtg. July 2nd, 1926.

I hereby agree to pay Grover C. Brown a reasonable fee for the services now rendered and to be rendered and if anything should happen to me I want him to be well paid for all his services, legal or otherwise.
                    "Henry V. Butler."

The proof of claim of Frederick W. Freeman as appears in the record. Exhibit B, and also Admr.'s BB, reads as follows:

"IN THE PROBATE COURT OF FRANKLIN COUNTY, OHIO.
In the Matter of the estate of Henry V. Butler,
deceased.                    No. 76376.

PROOF OF CLAIM

"Frederick W. Freeman being first duly sworn, deposes and says that for the past twenty years and more he has been engaged as a stock broker, engaged in the business of buying and selling securities; that he has been engaged in said business on the 8th floor of the building located at 16 East Broad Street, and has maintained his office there for more than twenty years, that said Frederick W. Freeman has been acquainted with Henry V. Butler for more than sixty years, and that on the 12th day of September, 1916, the said Henry V. Butler used and occupied the services and premises of the said Frederick W. Freeman in connection with the buying and selling of securities and in connection with the handling of his real estate addition in the city of Columbus, which was then being developed and which has been in the process of development, sale and liquidation, up to and including the 28th day of February, 1936, the date of the death of the said Henry V. Butler.

Frederick W. Freeman further states that since said September 12th, 1916, to the said February 28th, 1936, he rendered valuable service to the said Henry V. Butler in the buying and selling of securities and other financial and personal matters, and also in connection with the sale of the real estate of the said Henry V. Butler, the collection of accounts and closing of deals in relation to said real estate; that the said Henry V. Butler occupied the office of the said Frederick W. Freeman, using his telephones at all times, using his safes as depositories, using his bookkeepers and stenographers, using his clerks and experts as advisors, and while out of the office daily called by telephone the said Frederick W. Freeman or one of his employees in relation to the status of various forms of his business.

That the reasonable value of said services is $175.00 per month, which makes a total of $40775.00; that there is a credit on said amount in the sum of $19,367.01, leaving a balance due this affiant, Frederick W. Freeman, in the sum of $21,407.99.

That there is justly and truly due the said Frederick W. Freeman the said sum of $21407.99 and that the same should be credited to the amount charged against him in this estate.

In witness whereof the said Frederick W. Freeman has hereunto subscribed his name this 23rd day of June, 1936.

(Signed) Frederick W. Freeman

Witnesses

"M. H. Rector

"F. B. Paisly

Sworn to before me and subscribed in my presence this 23rd day of June, 1936.

(Signed) Grover C. Brown

Notary Public, Franklin County, Ohio
Grover C. Brown

The above claim of Frederick W. Freeman is hereby received and allowed this 23rd day of June, 1936.

(Signed) Lewis C. Freeman
Administrator."

It will be noted that this claim purports to cover a period from September 12, 1916 to January 28, 1936. Attention is also called to the detailed valuable services rendered; also that the charge is made at the rate of $175.00 per month, for the total period giving a total of $40,775.00. A credit is noted of $19,367.01, leaving a balance of $21,-407.99. There is no information as to the manner in which the credit arises. Through the evidence it appears that following the death of Mr. Butler certain securities were sold of the above value and thereafter credited, claimant contending that such securities were in his hands as collateral. The administrator in his Schedule of Debts lists the claim as follows:

"No. 18. Frederick W. Freeman, Cols. O. for services rendered and money expended, $21,407.99 Allowed."

Brown through his evidence claims to have performed services for Butler of various character from January 1, 1912, continuously to February 28, 1936. It is claimed to be of the reasonable value of $3000.00 per year, but in his proof of claim agreeing to take $100.00 per month with interest at 6% computed annually if the same is paid to him without any delay or without any trouble. The claimed services included not only acting for Mr. Brown in his legal matters but also his real estate operations including use of office and office force, room and board in the Brown home, transportation by automobile both on business and pleasure and locally and on extended trips. In short, the claim being that Brown did practically everything for Butler both in a business way and socially and in many instances where Butler could easily have performed the services himself. During the entire twenty-four year period Brown made no charges on his books and this same observation can be made as to Freeman during the twenty year period included in his charge.

The Master in his findings determined that the evidence disclosed an oral contract between Frederick Freeman and Butler whereby Freeman was to take care of the Butler real estate account for a consideration of 5%. Butler previous to 1926 had laid out an addition known as Butler's Highland Addition comprising some 300 lots and had made connection with several realtors for the sale of lots in this addition. In many instances the sales were made on payments and required close attention in making collections. In the main it was this fund that was handled by Freeman and upon which the Master found that he was entitled to 5% covering a period of six years prior to February 29, 1936.

The Master also allowed to Freeman the sum of $75.00 per month to cover other services for a period of six years holding that all services beyond six years were barred by the statute of limitations. The $75.00 per month allowance for the six year period, totaled

$5400.00. As to the Brown claim, the Master found that the claimed writing executed by Butler did not constitute a contract, and further that the same was void being induced by duress. He allowed Brown a compensation of $125.00 a month for six years or a total of $9000.00.

The question of attorney fees allowed to Brown as attorney for the administrator and also the administrator's fees previously allowed and paid was referred back to the Probate Court without recommendation or finding on the theory that these matters were peculiarly within the province of the Probate Court for determination.

Both the administrator and the exceptors filed exceptions to the report of the Master Commissioner and therefore regularly came up before the Probate Court for determination. The Probate Court upon hearing, coming to review the Master's report, affirmed in part and modified in part. The 5% credit to Frederick W. Freeman on the total fund of $12082.47 from March 1, 1930 to March 1, 1936, totaling $604.17 was allowed, and the further credit of $75.00 a month for the period of six years, totaling $5400.00 was disallowed, thereby leaving the total surcharges against Lewis C. Freeman, Admr., on the Freeman account the sum of $40,-444.83. On the Grover C. Brown claims the Probate Court affirmed the Master's finding, allowing $125.00 per month for a period of six years or a total of $9000.00. The Probate Court also disallowed as a credit to the administrator any and all amounts paid Grover C. Brown as attorney's fees for the administrator and also all fees paid the administrator as compensation.

During the taking of evidence it developed that approximately $40,000 worth of credits in the Butler estate were sold by Frederick W. Freeman to Grover C. Brown. Some controversy arises as to whether or not the sale and purchase as between Frederick W. Freeman and Brown was legally handled.

Upon motion to the Master and reference to Probate Court the latter ordered that so much of the identified securities as were in the hands of Brown be impounded pending the final determination of the hearing. The amount of the securities in the hands of Brown were probably less than half what he received from Frederick W. Freeman. Evidence was introduced that Brown had an agreement with his wife whereby she was to receive one-half of the amount paid to her husband out of the Butler estate less expenses and money paid out by Brown in his dealings with Butler.

Brown objected to the order of the Probate Court but complied and took exceptions. Thereafter within the statutory time he filed an appeal which is now in this court under No. 2980, and will be decided later as a separate appeal.

The determination of this case is extremely laborious. Besides the 2800 pages of the record and two volumes of exhibits counsel present more than 300 pages of briefs. We do not make the claim that we have read the record in its entirety. But we have examined each and all of the exhibits and have read and reread all the briefs. We have read certain parts of the record where there seemed to be conflict between counsel and all in all we think we have a pretty fair concept of the facts.

Counsel are to be complimented on the exhaustive manner in which they have located claimed authorities from the Ohio courts and other jurisdictions. We feel that we can proceed upon the assumption that an independent research will not be availing.

The assignments of error filed by counsel for the administrator cover six full pages, separated under 17 headings with the last specification re-classified under 12 headings. Counsel for appellant do not follow the specifications in order; therefore we think it would be preferable to discuss the claimed errors in the same order in which they appear in appellant's brief.

On page 69 of appellant's brief under the heading "Argument" is set forth the first topic heading as follows:

"The exceptions were insufficient because they merely plead by way of legal conclusion that the administrator 'wrongfully, unlawfully, fraudulently and contrary to the rights of this legatee' allowed the claims."

In support of this proposition the following citations are given:

**Truss v Clouse, 23 Abs. 610, 611.**

This is a per curiam opinion from our Court decided January 21, 1937, on appeal from the Court of Common Pleas, Miami County. The cause was submitted on demurrer to plaintiff's petition. The grounds of error were based on the claim that the Common Pleas Court had no jurisdiction of the subject matter for the reason that the Probate Court under the General Code had exclusive jurisdiction in the settlement of estates. We sustained this ground of demurrer. We made the further observation that the subject matter of the amended petition related to the conduct of the defendants as an executor in the settlement of his accounts, and further that the action was collaterally attacked on the settlement of defendant's accounts as a fiduciary. The action was one at law and required the application of no equitable principles. We further refer to the fact that the cause was exclusively vested in the Probate Court by the terms of §10501-52 GC, and this is especially true because there is no charge of fraud or collusion against the defendant affecting the settlement of his final account except in general terms and by way of legal conclusions. The fraud must be averred with distinctness and particularity. In support of the above we cited the following Ohio cases: **Rote v Stratton, 2 N. P. 27**, and **Crawford v Zeigler, 84 Oh St 224.** Other cases cited by appellant are the following: 19 O. Jur. 494, et seq.; U. S. v Bentley & Sons, 16 Fed. (2d) 895, (an Ohio case); **Britton v Baker, 12 O. Dec. 107**; Bates Pleading & Prac., 4th Ed., Sec. 1536, p. 1398; Silverschein v U. S., 266 U. S. 221; Phillips Pleadings, p. 697 and 698. We find nothing in these citations requiring comment.

In a strict sense exceptions to an account are not pleadings and are not considered with the strictness required in adversary proceedings in the Court of Common Pleas. **In re Foster Est., 12 Abs 298.**

The exceptions to the administrator's account are proper both in form and in substance.

### Topic 2.

"Even if the administrator erred in his judgment on the amount of the allowance that would not show fraud on his part. The exceptors failed to sustain the burden of showing that he did not exercise honest judgment in making the payments and hence failed to adduce facts essential to recovery."

This topic is so connected with the factual questions and other questions of procedure that we have concluded to discuss it later in connection with another topic.

### Topic 3.

"The burden rested on the exceptors to show that Lewis C. Freeman was guilty of fraud by clear and convincing evidence. Instead of so sustaining this burden they failed to show evidence of any facts that do not comport with the honesty and fair dealing of the administrator."

Our Court has passed on this question in the case of **Shilling, Admr., etc., v Ross, et, 16 Abs 458.** This case reached us on appeal from the Common Pleas Court of Miami County and was decided December 9, 1933. We were constrained to follow the principle announced in **Steward v Barry, Admr., 102 Oh St 129.**

The fourth syllabus in the decision of the Supreme Court reads as follows:

"4. When the correctness of a credit taken by an administrator in his account is challenged, the burden of es-

tablishing the validity of such credit is upon such administrator."

In the opinion at page 138 we find the following citations: 2 Wolmer's American Law of Administration (2d) §540; 1 Rockel's Ohio Probate Court Practice, (2d) Ed., §740; 19 Enc. Pleading and Practice, 1044.

On page 461 of our opinion in Shilling, Admr. v Ross, supra, we elaborated on what we considered the reason for the rule.

### Topic 4.
"Freeman had the right to act on the advice of the attorney he had selected who was approved by the Court and can not be held liable because he did so act."

Advice of counsel is very frequently a complete answer to a fiduciary's action, but there are many exceptions to the rule. For instance, the ▆▆▆▆▆ ▆ allowance and payment of an attorney's bill against the estate on the advice of the same attorney who happens to represent the administrator, may be fraudulent conduct on the part of the administrator where the evidence discloses that such fiduciary failed to act in the premises in the usual and ordinary manner; likewise, where the administrator allows and pays to his brother a very large amount when he so acted on the advice of his counsel. There might still be raised the question of fraudulent conduct when considering the attending facts.

### Topic 5.
"The filing of the Schedule of debts was notice to all interested in the estate that the claims here in question had been allowed; exceptors idly sat by and failed to file any objections to the schedule, thereby inducing the administrator to make the payments; hence they may not hold the administrator responsible."

The provision for schedule of debts is comparatively new and first appeared in the new Probate Code effective January 1, 1932. The applicable sections are §10509-118, §10509-119, and §10509-120 GC. Like all new legislative enactments it takes considerable time before their scope and intention are fully construed by courts of last resort. All of the courts are having their difficulties with these sections. Sec. 10509-118 GC, reads as follows:

"**Schedule of debts.** Not later than five months after the date of his appointment, every executor or administrator shall make and return upon oath into court a schedule of all known claims, debts and liabilities against the estate, including any which may be known to the executor or administrator but not presented. Such schedule shall state the name and address of each claimant, the amount claimed, whether allowed or rejected, whether secured by mortgage or otherwise and the date of maturity if not yet due."

In the instant case the Schedule of Debts was filed July 29, 1936, which was within the five months prescribed under §-118. Included within the schedule of debts was the claim of Grover C. Brown in the sum of $66,027.00, marked "Allowed", and the claim of Frederick W. Freeman, Columbus, Ohio, for $21,407.99, marked "Allowed".

Sec. 10509-119 GC, reads as follows:

"**Notice of hearing given by publication: notice to certain creditors; exceptions.** Upon the filing of the schedule of debts the court shall forthwith set a day, not later than one month after the day such schedule of debts was filed nor prior to one week from the day of publication of notice for hearing thereon. One week's notice of the hearing shall be given by publication thereof in a newspaper of general circulation in the county. If more than one schedule is specified in such notice the costs must be paid in equal proportions by the respective estates. In addition to the notice by publication ten days' notice of the hearing shall be given to all creditors whose claims are

shown on the schedule to have been rejected in whole or in part by the executor or administrator.

For good cause the hearing may be continued for such time as the court deems reasonable. Exceptions to the schedule of debts may be filed at any time prior to five days before the date set for the hearing or the date to which such hearing has been continued as provided herein by any person interested in the estate. When exceptions are filed, notice of the filing thereof and the day when the same will be heard must forthwith be given to the executor or administrator and to his attorney, and to the claimant or claimants whose claims are in question and their attorneys, by registered mail or personal service, unless such notice is waived. At the hearing the executor or administrator and any witness may be examined under oath The court shall have power to affirm, modify or reverse the action of the executor or administrator as to any item contained in the schedule of debts, excepting action on claims on which suit has already been brought, or which have been referred to referees, or which have been disallowed by requisition; and may dispose of any other matters properly raised by exceptions without the intervention of a jury.

Subject to the right of review, and to be opened up for fraud, collusion or mistake, the finding and order of the court shall be final as between parties who have filed exceptions or otherwise voluntarily entered their appearance."

The Probate Court according to the provisions of the above section set a day for hearing and gave notice thereof by publication. No exceptions were filed to the schedule of debts. At the expiration of the statutory time the Court affirmed the schedule of debts and shortly thereafter the administrator caused the Brown and Freeman claims with others to be paid in full, taking receipts therefor. Special attention must be given to the last paragraph of §10509-119, which reads as follows:

"Subject to the right of review, and to be opened up for fraud, collusion or mistake, the finding and order of the court shall be final as between parties who have filed exceptions or otherwise voluntarily entered their appearance."

It is the opinion of the majority, not concurred in by Judge Guernsey, that since no exceptions were filed and no voluntary appearance entered, the finding and order of the Probate Court affirming the schedule of debts is not final and there still remains a remedy through filing exceptions to the account as provided in §10506-40 GC. It is the view of Judge Guernsey that the proper procedure to follow would be to remand the case on finding of fraud with directions to the Probate Court to open up his affirmance of the schedule of debts so as to permit exceptions to be filed thereto, bringing in as parties as to the hearing Grover C. Brown and the estate of Frederick W. Freeman and thereby permitting the hearing to proceed against Brown and Freeman and if the claims are found to be fraudulent, judgment could be entered against Brown and the Freeman estate. Judge Guernsey will more aptly set forth his views in his dissenting opinion. We only mention in a general way our understanding of his conclusions as a predicate to our view of the law. We think that the plan outlined by Judge Guernsey with some modification would be preferable to the present remedy of exceptions to the account. However, the old statutory remedy of exceptions to the account having been retained in the new Code with additional provisions, we are unable to determine that any of the procedural remedies are taken away save and except where exceptions are filed to the schedule of debts in which instance as expressly provided in the last paragraph of §10509-119 the finding and order of the court shall be final. In our judgment this is equivalent to saying that in all other instances it is not final, and hence we must look for a remedy, if any, and find it in the old and orig-

inal provisions in exceptions to accounts.

In addition to the sections providing for schedule of debts we have examined Rockel's Ohio Probate Practice, §562; Adams & Hosford's Ohio Probate Prac., p. 821; 4 Page & Adams, General Code; Lamneck's Probate Digest, §§580, 581, p. 376; Suppl. of Deibel's Ohio Prac. under Rule IX, p. 188, 189, and also our own decision in the case of **In re Estate of Perkins, 22 Abs 513; Crawford v Ziegler, 81 Oh St 224.** In the case of In re Estate of Perkins, supra, we made the following observation:

"The section serves a useful purpose, if the schedule filed thereunder is correct and approved by the court, it providing a means whereby the creditors and the heirs may be advised of the number and character of the claims presented, whereby the executor or administrator may be protected in the payment of those claims which have been allowed by him and which allowance has been confirmed by the court."

We still adhere to the above provision as it applied to the facts of the case then under consideration, but in the reported case we did not have before us the question of fraudulent allowance of claims. We still think that the sections relative to schedule of debts if amended so as to meet questions not now provided for in the act would be **an** advance step much to be desired.

Topic 6.

"Brown was not a party to the proceeding in the sense that his testimony should have been rejected under §11495 GC."

During the taking of the evidence before the Master counsel for exceptors interposed objections to Grover C. Brown's testifying in the proceeding. The objections were based on inhibitions provided in §§11495 **and** 11494 GC. The pertinent portion of §11495 reads as follows:

"When parties shall not testify. A party shall not testify when the adverse party is the guardian or trustee of either a deaf and dumb or an insane person or of a child of a deceased person or is an executor or administrator or claims or defends as heir, grantee, assignee, devisee or legatee of a deceased person."

The portion of §11494 GC pertinent to this question reads as follows:

"Privileged communications. The following persons shall not testify in certain respects: 1. An attorney concerning a communication made to him by his client in that relation or his advice to his client; * * * but the attorney * * * may testify by express consent of the client * * *; and if the client voluntarily testifies, * * * the attorney * * * may be compelled to testify on the same subject * * *."

It was the ruling of the Master that he would permit all testimony to go into the record subject to objection and prior to making his report to the court would indicate his ruling on all objections in the presentation of testimony. It is our judgment that the Master was correct in adopting the procedure of having all testimony appear in the record for the reason that if the Court appointing the Master should rule differently the evidence would be at hand upon which the Probate Court could make a final determination.

The result was that approximately 2000 pages of testimony appear in the record as having been given by Brown and practically all of which was ruled out by the Master and concurred in by the Probate Court by reason of the claimed fact that Brown was a party to the proceeding and was not permitted to testify under and by virtue of the provisions of the first paragraph of §11495 GC, heretofore quoted in full. We are unable to agree with the determination of the Master and the Probate Court that Brown was a party to the proceeding then being heard. A short resume of the institution of the pro-

ceedings and the step taken through the hearing will, we think, ▬▬▬▬▬▬ demonstrate that Brown was not a party.

During the lifetime of the decedent Butler, Brown claimed to have been his attorney and further that a very large sum was due him at his death. Lewis C. Freeman was appointed administrator with the will annexed of the estate of Butler and following his appointment selected Grover C. Brown as his attorney in his fiduciary capacity. The estate proceeded to the point where the administrator with the will annexed with the aid of his attorney Brown prepared and filed first account. The heirs, devisees and legatees filed exceptions to the account, and the principal, if not sole, ground of exceptions was the allowance and payment by the administrator of two very large claims, one being that of Grover C. Brown, totaling $66027.00 and the other claim being that of Frederick W. Freeman in the sum of $40,775.00 with a credit of $19,367.01.

In the course of the hearing counsel for the administrator called as his first witness Grover C. Brown. The purpose of calling this witness was to meet exceptor's imputations of fraud by bringing out the extent, character and kind of service performed by Brown for Butler over a period of 24 years, and all for the purpose of showing that the amount was due and payable and therefore the administrator could not be guilty of fraud in making payment to Brown. The rule of law is well recognized in Ohio and in other jurisdictions having similar ▬▬▬▬▬▬ procedural acts that a mere witness may not be precluded from testifying although such witness may be interested in the controversy and would not be permitted to testify were such a witness a party to an action in which the subject matter was a claim against a decedent's estate then being represented by a fiduciary.

It further developed while Brown was on the witness stand that he had purchased either from Freeman, Admr., without order of sale, or from Frederick W. Freeman, broker, on an attempted sale of collateral stocks and bonds totaling nearly $40,000.00. Immediately on the presentation of this evidence counsel for the exceptors claimed discovery of assets and requested that same be impounded. The Master referred the question to the Probate Court and there an order was made that Brown deliver such stock as he had into the Probate Court to be there held jointly for future disposal as might be made.

Brown resisted the above procedure, but handed the stock over under objections. The claim is now made that this action made Brown a party to the hearing and for this reason, if none other, Brown should be barred from testifying.

We think that it is the unanimous holding under Ohio authorities under facts such as involved in the instant case, that Brown would not be determined to be a party.

**Stream v Bernard, 120 Oh St 206, 211.**
**Milling Co. v Bunn, 75 Oh St 275.**
**Powell v Powell, 78 Oh St 331.**
**Hubbell v Hubbell, 22 Oh St 208.**
**Loney v Walkey, 102 Oh St 18, 70 C. J. 269.**

At this point we might say that we are not impressed with the statutory rule which would preclude a claimant with unquestioned integrity from testifying under the inhibitions contained in §11495 GC, and on the other hand where a claim is paid either properly or improperly by a fiduciary the claimant thereafter claimed right to testify on exceptions to the fiduciary's account. However, the rule is well grounded by reason of the fact that the statutory language limits the individuals that can not testify as follows:

"A party shall not testify," etc.

Our attention is now directed to a very important provision in the last four lines of the above section which reads as follows:

"And when a case is plainly within the reason and spirit of the next three preceding sections though not within the strict letter, their principle should be applied."

On a casual examination we can see a very strong reason for holding that the instant case is within the reason and spirit of the three sections referred to. However, certain decisions of the Ohio Supreme Court remove the first impression.

The Ohio authorities hold that since the statute expressly provides that parties in a certain class may not testify there is no reason to invoke the last four lines of §11495 GC. In other words, it is improper to attempt to apply reason and spirit to a specific enactment. These decisions call attention to the provisions of the common law which prohibit a party from testifying and then the abolition of this rule by statutory enactment, now §11493 GC, which provides:

"All persons are competent witnesses except those of unsound mind, children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined or relating to them truly."

Secs. 11494 and 11495 GC are exceptions to §11493, and therefore must be strictly construed.

Reasoning further, it is held all persons are competent witnesses unless they fall in a class expressly prohibited. Extending the reasoning further it should be said that the reason and spirit of the three sections may not be construed to exclude witnesses from testifying unless they come within the express restrictions mentioned in §11494 and §11495.

Under this pronounced law we are frequently presented with facts where it can appropriately be said that the rule of exclusion could be applied but are unable to so hold because the witness does not come within any of the classifications denying their right to testify. We now refer to Page's Ohio General Code, Vol. 8, §11495—Note 17. The statement of the compiler immediately under note 17 reads as follows:

"The so-called 'reason and spirit' clause in §11495 GC, can not be invoked or apply in contravention of the express provisions of that action or the two preceding sections of the statute relative to the competency of witnesses."

In support of this text we cite the following cases:

Cochran v Almack, 39 Oh St 314.
Keyes v Gore, 42 Oh St 212.
Powell v Powell, 78 Oh St 331.
Loney v Walkey, 102 Oh St 18.

Applying the principle to the instant case we find that Attorney Brown was not a party to the proceedings brought by heirs, legatees and devisees of Butler through exceptions to the first account of Lewis Freeman, Administrator.

Grover C. Brown was not a party to the proceedings by way of exceptions to the administrator's account although the very large claim of Brown previously paid by the administrator with the will annexed was one of the grounds of exceptions.

Brown, before the death of the decedent Butler, had been his attorney for a number of years. This is the situation which we referred to earlier when we said that courts were frequently confronted with facts which ought to be a basis of the law for exclusion as a witness. The difficulty is that Brown, not being a party, may not be excluded even though he is interested indirectly in the outcome of the litigation. We have examined the following citations from the brief of appellees.

Volume 42, O. Jur. under subject "Witnesses", §158, p. 165.
In re Helfrish, 30 N. P. N. S., 307.

Snow ex rel Exrs. v Fulton, et, 51 Oh Ap 514.

Liggett v Glenn, 51 Fed. 381, 396.

Wigmore on Evidence, 2d Ed. Vol. II, §§725, 766.

The text under **42 O. Jur., §158. p. 165,** merely states general principles and is not at all helpful in the instant case.

In re Helfrish, supra, differs in its facts and we would have no difficulty in following the court's decision in that case. Snow ex rel Exrs. v Fulton, supra, is distinguishable but is the nearest approach to the rule contended for that we have examined. The remaining citations refer more particularly to privileged communications as announced in §11494 GC.

In our judgment Brown's testimony should not be rejected on the ground of privileged communications. The scope of inquiry of him as a witness exclusively pertained to fees, etc. The text in **42 O. Jur. 288, 289** completely covers the situation and holds that an attorney in matters pertaining to his interest has a right to testify and is not precluded from so doing by virtue of §11494 GC. Other supporting authorities are the following:

28 R. C. L. 552.

2d Mechem on Agency, §2313.

**Petrucelli v Steinharter, 24 Oh Ap 471.**

The rule is very broad which permits testimony of an attorney in support of his claim for fees. It is our finding that the Master and the trial court were in error in their finding that under §11495 GC the testimony of Brown could not be considered.

Topic 7.

"Butler executed a written contract to pay Brown for services performed and to be performed, directing that in case of his death Brown should be well paid; this prevented the barring of any part of his claim because of the statute of limitations. "Butler having expressed the wish that Brown should be paid, it should not have been rejected even if it had been barred; and no liability may be imposed on the administrator for paying it."

The claimed contract executed by Henry V. Butler to Grover C. Brown is heretofore copied in full on page 8. The Master, concurred in by the Court, concluded that the document did not constitute a valid and enforceable contract. The Master in his report rejecting the written instrument as a legal contract quoted at length from **9 O. Dec. Rep. 353-354:**

"We therefore declare in all cases where the relation of attorney and client exists and it is desired to make further professional engagements: 1. That it is the duty of the attorney to have the contract (if there be one) clearly and definitely stated and understood, not only in its language, but also in its spirit, legal consequences and practical results. 2. That the means used to obtain the contract be free, not only of fraud, actual or constructive, but also of any other inequitable consideration. 3. That every material circumstance or fact connected with the execution of the contract, calculated to inform the client of his rights and responsibilities, be declared to him without reservation. 4. That the attorney inform himself of all such facts and circumstances, which would reasonably come within the knowledge, and which would likely contravene the execution of the contract by the client. 5. That he does not contract for greater benefit than his services are reasonably worth with reference to the trouble and difficulty of the particular case, amount involved, either of a pecuniary character or reputation personally, etc. 6. That the onus should devolve upon the attorney to show that the contract was free from all fraud, undue influence and exorbitancy of demand."

It is in evidence that on this date, February 8, 1928, certain securities listed in the written document, were in the hands of Grover C. Brown for some purpose, and that before delivering

them to Butler on the latter's request he demanded a settlement of the amount due him from Butler. Brown testified that following this ultimatum Butler dictated to Richard L. Garnett, an attorney who was then in Brown's office, and that Garnett typed the document, after which it was signed by Butler and delivered to Brown. There was also testimony that the securities listed in the document of February 8th were then delivered to Butler. The Master in support of his findings made the following presentation of authorities:

Page on Contracts, Vol. 1, Sec. 409.
**Ry. Co. v Gaffney, 65 Oh St. p. 104.**
**Suydam v Cols. Ins. Co., 18 Ohio 468.**
**Hill v Henry, 17 Ohio, p. 9.**
Osborn v Hopkins, 160 Calif. 501, 35 C. J. p. 828.
Ennis v Pullman Palace Car Co., 165 Ill. 161.

Counsel for the exceptors in their brief cite the same authorities as are set out in the Masters report, and others of like import which we do not consider necessary to separately list. Counsel for the administrator cite and comment on the following authorities: **Streeper v Myers, 132 Oh St 322;** same case, **23 Abs 295-300.** The above case was decided in our court and taken on appeal to the Supreme Court. In both courts the pronouncement was made that the expression, "if anything happens to me" are synonymous with the expression "on my death" or "when I die". We take it that the only purpose of citing the Streeper case, supra, is by reason of the language used by Mr. Butler in the written document of February 8, 1928, wherein he says,

"If anything should happen to me".

By reason of the decision of the Supreme Court in the Streeper case we are compelled to construe the language of Mr. Butler as meaning at the time of his death.

Also cited in appellant's brief is,
25 O. Jur. 559.
**Rudy v Rudy, 14 C. C. N. S. 545.**
Wood on Limitations, p. 348.
**Snyder, Exr. v Roland, 102 Oh St 372.**
**Ardinger v Bell, 17 Abs 438.**
**Southern v Kerson, 13 Oh Ap 289.**
17 R. C. L., p. 798.
Bennett v Lutz, 94 N. W. 288.
Sullenger v Ahrens, 150 N. W. 71.
Switzer v Bates' Est., 129 N. E. 632.
Gardner v Marquis, 275 N. W. 495.
**Sec. 11233 GC.**
**Haymaker v Haymaker, 4 Oh St 272, 275.**
**Deering v Miller, 9 C. C. N. S. 392.**
**Platt v Scribner, 18 C. C. 453.**
Cox v Monday, 95 S. W. (2d) 785.
Ward v Wood, 10 West. L. J. 506.
Brooks v Otis, 2 W. L. B. 491.
**Sturges v Barton, 8 Oh St 215.**
Wood on Limitations, 4th Ed., §95.
Gruenberg v Buhring, 16 Pac. 486.
Ireland v McIntosh, 22 Utah, 296, 306.
Brownhopsky v Powers, 1 Utah 333.
**Sec. 11233 GC and §11221 GC.**
11 R. C. L. 216.
Deibel's Ohio Probate Prac., p. 995.
Weeden v Nichols, 72 N. J. E. 366. (65 Atl. 445.)
West v West, 8 Howard (U. S. Supreme Court) 402.
Miller v Dorsey, 9 Md. 317.

The citations above listed support appellant's position. We very readily agree that Butler executed a very foolish agreement but that is not the question we have for determination. When it is determined that Butler signed the document we can find no infirmity therein. In answer to the argument that it was procured through duress we find the complete answer to this claim in that Butler during his lifetime took no steps to set it aside, but on the contrary continued to do business with Brown during the remainder of his life.

The case of **Rudy v Rudy, 14 C. C. N. S.** has many similar facts to the instant case and therein it was the determination of this court that the contract was continuous and not barred by the statute of limitations although the claimed services began February 15,

189?, and ended July 10, 1911. Without making special reference to the remaining citations other than to say they are supporting, we are forced to the view that the written document constituted a contract and being continuous under its terms would void the statute of limitations both before and after its execution.

## Topic 8.

"Butler was indebted to Freeman and Freeman owed Butler, who stated that his credits and securities with Freeman were to secure his indebtedness to Freeman; hence Freeman had the right to apply the doctrine of compensation of cross-demands to the mutual charges and credits, with the consequence that the statute of limitations did not apply to his claim."

The evidence proves conclusively that Butler spent very much of his time in the office of Frederick W. Freeman. The principle business of the latter was a licensed stock broker although in connection therewith he had some other business. He had in his office as employees a stenographer, bookkeeper, and salesman. He was not a member of the New York Stock Exchange, nor the Columbus Stock Exchange  Butler was a dealer in Freeman's office, buying some stock direct and others on margin. In addition Butler had considerable real estate in various parts of the city which demanded constant attention. In 1926, he opened up from an acreage which he owned what was known as Butler's High Ridge Addition, containing approximately 300 lots. Butler was interested in placing these lots on the market and secured the aid of Freeman and his office force in contacting realtors and others experienced in the development of additions. Among others he procured the services of William E. Curry, real estate broker. A contract was entered into between them in 1926. the same being introduced in evidence under Exceptors' Exhibit 37. From time to time Butler constructed buildings and thereafter the collecting of rents

was an additional problem. He made arrangements with Mr. Freeman by which the office would do the bookkeeping on his various real estate operations. Witness Curry testified that Lewis C. Freeman told him that they were making collections for Mr. Butler on the basis of 5% and that Frederick Freeman afterwards confirmed this statement. The Master and the Court allowed some $600.00 which was 5% on the total collections for a period of six years. It was the holding in the court below that the per cent on the remainder of the collection should be barred by the statute of limitations. In this we think the lower court was in error: Freeman owed Butler and Butler owed Freeman. At the time of Butler's death there remained in Frederick Freeman's hands from collections more than $8000.00. Consequently there would be cross-demands between Freeman and Butler which would bar the running of the statute of limitations. The law is well defined that where there are cross-demands the statute of limitations will not run against either.

Sec. 11321 GC.
25 O. Jur. 573-574.
Nasby Bldg. v Wallbridge Co., 6 Oh Ap 104-108.

Counsel for appellant in their brief cite many cases of other jurisdictions holding to the same principle. The agreement between Frederick W. Freeman and Henry V. Butler for doing his bookkeeping and collecting and handling money coming in from his local activities such as rents, monthly payments on land contracts and others was executed in 1926. Apparently Butler drew out from Freeman's office very little, if any, of this money, so that at his death there remained in Frederick W. Freeman's hands in what was known as the Butler real estate account something more than $8800.00.

This amount was built up from 1926 and from that time on there was mutuality of accounts with Freeman having in his hands more than sufficient

to pay any and all obligations due Freeman.

It therefore follows that the 5% found by the Master to be due Freeman under the contract to pay for handling the funds on the basis of 5% should be figured to 1926. It will be necessary to make a recalculation as to the amount of funds handled by Butler in this real estate account from the date of the contract in 1926, until the date of Mr. Butler's death. In addition to the 5% allowed by the Master he also allowed for additional services and the use of Freeman's office by Butler the sum of $75.00 per month for six years or a total of $5400.00.

The Probate Court on considering exceptions thereto disallowed any monthly compensation on the ground that he was unable to find in the record any basis for finding an agreement to pay, either express or implied.

It is our judgment that the record does disclose facts supporting an intention to pay.

It is true that the Master in determining a 5% compensation on Butler's real estate account for a period of six years necessarily accepted the testimony of William E. Curry, a real estate broker who at about this same time had entered into a contract with Mr. Butler to handle and develop the High Ridge Addition. As we read the record no other witness testified as to this 5% contract. At the time of taking the testimony on exceptions, Mr. Frederick W. Freeman had deceased and hence the record was deprived of his version of the agreement, if any, between himself and Butler.

Evidently there was no written agreement since the office force who had charge following the death of Mr. Freeman, produced none. It very clearly appears that the charge of Frederick W. Freeman as to any claim that he might have against Butler was based on an implied agreement on the part of Butler to pay what the services were reasonably worth. The evidence discloses very clearly that from 1916 on to the time of his death Mr. Butler spent a great deal of time in the office of Frederick W. Freeman. In 1926 following the laying out by Mr. Butler of the High Ridge Addition, the daily routine in the office was increased very substantially. The record contains evidence that Mr. Butler at different times stated to various people that he was expecting to pay Frederick W. Freeman for the service that was being rendered to him. It is our judgment that this acknowledgment and intention to pay, taken in connection with the nature, character and volume of business taken care of by Frederick W. Freeman would be the basis for legal charge. Mr. Butler, placing his name in the corridor directory, giving his office address the same as that of Mr. Freeman, the use of the telephone very frequently and with no limitations, the use of the various offices, the calling of the office force, any and all, for assistance to him whenever wanted and other similar details, is a service usually paid for by the month and we think that the Master's finding of an allowance of $75.00 a month would be very fair to all parties, but the amount should be extended from 1926 at the time that Freeman contracted with Butler to take over the bookkeeping, etc., to the date of Butler's death.

Topic 9.

"Frederick Freeman on the death of Butler had the right to take over the stock at the market value without any order from the court.

"In any event the administrator is not liable for what Fred Freeman may have done."

We do not think that the record presents facts which would authorize Frederick Freeman on the death of Butler to take unto himself the stocks and bonds belonging to Butler. We have read with care the testimony of the several witnesses from the Freeman office, but must confess that we are not able to fully understand the nature and character of all of Butler's holdings nor the exact plan under which different stocks and bonds of Butler's were held.

We have an idea that there were certain stocks not identified as to name or amount but of considerable value that were owned absolutely by Mr. Butler and kept in the office of Mr. Freeman, not as collateral for any obligation, but simply for safekeeping. If we remember correctly these stocks were kept in the big safe in the office. We also think we understand that Mr. Butler was a margin trader, and that a certain amount of cash would be put up to protect the margin if the rise and fall of the stock in future days demanded additional margins. In other words, we get the idea that Butler was margining his stock many times over and above the broker's requirements. We also get from some source that certain stocks were up with Vercoe & Company. In short, we are compelled to say that we are too unfamiliar with the methods of dealing in stocks and that we are unable to fully understand the details of handling all the stocks.

We do say, however, that we are unable to determine that Frederick W. Freeman had any lien on the stocks and bonds which would authorize him to take them into his own possession and sell them either to himself or to any one else. So far as cross-demands were concerned, it would not include the stock for the reason that the cash in the hands of Freeman was more than sufficient to pay off any and all obligations due Freeman.

We therefore find that Frederick W. Freeman wrongfully appropriated certain stock belonging to the Butler estate. The term "certain stock" is meant to include all stock held and owned by the Butler estate and that was sold by Frederick Freeman. A better understanding might cause us to modify the above holding relative to margin interests held by Butler. Something was said in the record as to a custom with stockbrokers to close out all marginal interests at the market price on the day of the death of the owner and holder. If counsel can agree that such was the custom or that the record conclusively shows such to be the custom, or by additional evidence before the

Probate Court on remand can make such showing, then the ruling of this court will be modified as to the stock held on margins.

As to whether or not any order is to be made against Lewis C. Freeman relative to the stock must depend on what, if any, possession and control of the stock in question was had by the administrator. If Lewis C. Freeman, Admr., after his appointment, had possession of any or all of the stock in question and turned any part thereof over to his brother Frederick W. Freeman, the administrator would be liable for an unlawful conversion of so much of the stock that he so handled. If on the other hand Frederick W. Freeman at the time of the death of Henry V. Butler had in his possession any part of the stock of Henry V. Butler and sold the same upon his own authority under a claimed pledge, such act on the part of Frederick W. Freeman would be a conversion and action might be brought by the present administrator d.b.n. for the recovery of such stock unlawfully converted or the value thereof with interest.

If desired, this stock illegally appropriated may be traced into the hands of any one having knowledge of the improper method of making the sale and transfer.

### Topic 10.

Should the administrator be required to turn back into the estate moneys paid to Grover C. Brown as attorney fees for the administrator and allowed by this court; and also administrator's compensation drawn out from the estate on order of the court?

As we understand the finding of the Probate Court, attorney fees and administrator's fees were disallowed in the nature of a penalty by reason of fraudulent action on the part of the administrator in allowing the claims of Grover C. Brown and Frederick W. Freeman. This position of the Probate Court in taking such drastic action as will tend to induce faithful and honest conduct on the part of fiduciaries

is commendable. It is highly possible and probable that we are over indulgent, but we are constrained to the view that both the administrator and his attorney rendered valuable services to the estate and but for the unfortunate incident that resulted in the administrator's resignation other and future fees and compensation in large amounts would probably have been paid.

The Circuit Court of Hamilton County in 1886, deciding the case of **Sophia Campbell, Admr. v John H. McCormick, Admr., 1 C. C. 504,** used the following language in Syl. 3:

"Under our statute an administrator is legally entitled to the statutory commissions on the amount of the personal estate collected and accounted for by him and of the proceeds of the real estate sold under an order of the court for the payment of debts although he may have failed to charge himself with all the assets received by him, or has asked for credit for sums not paid by him. Even if there be unfaithful administration of the estate, it will not deprive executor or administrator of a right to compensation for his services so far as they have been beneficial to the persons interested in the estate."

Following the principle herein announced it is our judgment that the value of the services rendered by the administrator and his attorney to the estate equalled the amount allowed by the court and paid and should not be ordered refunded.

Topic 11.
Was the estate indebted to Brown?

We have already indicated our disagreement with the lower court on the question of a written contract and also on the question of the statute of limitations.

It is our holding that there was a written contract and by reason thereof the statute of limitations would not run. As we have it, no one questions the signature of Henry V. Butler to the written document of February 8, 1926. We again say that we do not pretend to base our conclusions on our reading the record in its entirety, but rather that no question seems to be raised but that Mr. Butler signed the written document for whatever it was worth. Having arrived at the conclusion that the paper document was executed, we can find no infirmity therewith. We have heretofore stated that it was a foolish contract to make, but courts may not set aside written instruments because of their foolish provision. In this written document he says he wants Grover C. Brown to be paid "for services now rendered and to be rendered and if anything shall happen to me I want him to be well paid for all his services, legal or otherwise." The provisions contained in these few lines are very, very broad. No attempt is made to fix the rate of pay, but under its terms is based on a quantum meruit. The words, "if anything happens to me" have a well defined meaning; it having been judicially determined that the words used mean "when I die" By a very simple construction of the writing it would read thus: "Whatever Grover C. Brown has done for me in the past and does for me in the future I want him to have a reasonable fee and when I die I want him well paid for all his services, legal or otherwise."

The Master and the trial court determined that the written document had infirmities which prevented it from being a contract and hence no consideration could be given to it. It was further held by the Master and concurred in by the Court that the services for a period of six years preceeding the date of the death of Henry V. Butler would be equal to $125.00 a month or a total of $9000.00. This being a factual question it is not within the province of a reviewing court to determine the technique to be used by the fact finding court. If we may be pardoned for the suggestion, we would like to say that it does not seem to us

that a monthly allowance for an attorney's services will ever correctly reflect the value of such services. On this question of value of services we think that a weekly, monthly or yearly basis would correctly represent the value of the services to Frederick W. Freeman. If may sometimes happen in our experience, but very rarely, that attorney fees are on the basis of a monthly charge, although almost universally the method is to make a charge for each piece of work done. One piece of work may be done in an hour, another in several hours, still others in several days. Litigation in court may take weeks. It is not unusual for the lawyer to keep track of the actual time spent on each case and when the case is finished make a charge based on several elements, first, the time spent in the office working on a case; second, time spent outside looking up evidence; third, time spent in the trial of the case; fourth, the result of the litigation, if it be a litigated matter; fifth, the importance of the litigation over and above the amount involved; sixth, the ability of the client to pay. In the drafting of deeds, mortgages, land contracts and similar matters the amount of charges for these services is rather uniform. It is not necessary to run through the entire list of work that might come into a lawyer's office and the means at hand of determining values. Reference is made in the brief to other services performed by Brown not in the nature of law business. We find nothing in the record that would not admit of a well recognized method of determining value.

We have heretofore held in this opinion that the burden of proof in determining what part of the Brown claim may be allowed to Freeman, Admr., as a credit rests upon the administrator. We ascertained from reading all of the administrator's testimony that he knows very little in detail and deals very much in generalities. A great deal of this support of Brown's claim has come from the latter's testimony. The wife of Mr. Brown presents evidence of some details as to work done. Two or three lawyers formerly working in Mr. Brown's office also furnished detail as to services performed. Brown's mother-in-law is corroborative to some extent, but gives little evidence as to value. Brown did not keep a set of books in which was recorded in regular form the day and date, services performed and amount of the charge. Counsel for appellant in his brief makes the statement that there is no requisite of the law that any one must keep books in order to recover for services. This observation is unquestionably correct, but where an individual sees fit to permit his claim to run for a period of twenty-four years without keeping a record, thus presenting a charge of over $60,000.00, the trial court, if it sees fit, might say to such a claimant, "you are within your legal rights in not having a book of accounts, yet in the absence of such book the court will be within its right in saying that you must set out and prove with a degree of definiteness the character of the work performed, day and date and time and then a reasonable charge for such services." Of course, the court might further say that "unless you have produced through your evidence adequate proof, that the court will make no allowance to you for such claimed item because of failure of proof." In other words, if the claimant for twenty-four years has been negligent in preserving data through which there may be presented to the court a full and complete understanding of the work done or service performed on each and every item upon which a claim or charge is based, may not the court say that there is a failure of proof as to each and every item that falls within this category? Our purpose in making the observation is due to the fact that from the evidence presented we are unable to see how a charge of $125.00 per month would be justified.

We are only interested in having allowed to Grover C. Brown the full amount coming to him as he is able to demonstrate through legitimate evidence of probative value. If through

lapse of memory, decease of witnesses or any other cause Grover C. Brown is not able to bring to the court evidence of the quality above suggested, then he will have nobody to blame but himself in not having kept a set of books showing detail charges.

If a part of Brown's claim is based on board and room and the evidence shows that such service is continuous between given periods, it would not be out of line to ascertain the amount through weekly or monthly charges, since that is the usual method of determining the charge for room and board. Other services may come in the same category, but we can not see that attorney's fees are ordinarily charged on a monthly or yearly basis. When charges for attorney fees are made on monthly or yearly basis it is always by reason of an express contract. We do hear of lawyers being employed by the year, but we do not understand that any such claim is made in the instant case.

Since we have determined that the Master and lower court did not adopt the proper method in determining the amount the administrator was being surcharged by reason of Browns claim of over $60,000.00, it is necessary to remand the case with instructions to redetermine on the basis that there was an existing written contract and that the statute of limitations does not apply. In the remand we also direct that the claim of Frederick W. Freeman be re-calculated as indicated in earlier pages of this opinion.

## Topic 12.

Was the administrator guilty of fraud?

Thus far we have been giving a rather complete chronological history of the entire case, together with a detailed discussion relative to the allowed claims of Grover C. Brown and Frederick W. Freeman. It is quite true that fraud is not always established through the administrator paying claims that are excessive. It is impossible to set forth a state of facts that would constitute fraud under varying conditions. We are very thankful for the cited language of Lord Hardwicke, taken from Parks' History of Chancery, 508, reading as follows:

"Fraud is infinite, and were courts of equity to lay down rules how far they would go and no further, in extending relief against it, or to define strictly the species of evidence of it, the jurisdiction would be cramped and perpetually eluded by new schemes, which the fertility of man's invention would contrive."

That Lewis C. Freeman, Administrator with the will annexed, was guilty of fraud in allowing the claims of Grover C. Brown and Frederick W. Freeman we have not the slightest doubt. We have read his testimony in its entirety and comparatively it is very brief and deals almost exclusively in generalities; he knows very little of detail. He is very positive that he acted in good faith and paid the respective claims because he considered them proper. He says that he took the advice of his counsel, which ordinarily is a proper thing to do, but under the situation in the instant case was an improper thing to do. The claims were allowed on the same day that they were prepared, although he does say that they were discussed previously. He makes the peculiar statement in substance that "we were watching the four months within which claims had to be presented." This would indicate that he was more interested in the claimants getting their claims in than he was in the administration of the estate. The size of the claims would warn any administrator to stop, look and listen. The care and investigation on extremely large claims would be quite different from what would be expected on small claims. A very natural procedure of an administrator or of any one else, when two claims were presented aggregating more than $100,000.00, covering periods of over twenty

years, would be to ask for the book of accounts. Not being able to have presented to him books of accounts, because none were kept, the duty of the administrator would be clear that he should at once reject the claims. Considering the testimony of the administrator in its entirety, showing what he did do and what he failed to do, fraudulent conduct is established and the only thing that can relieve him of being surcharged would be the establishing that the two claims were substantially correct and payable. We have no hesitation in saying that the record clearly shows the incorrectness of the claims and that the administrator should be surcharged in a very substantial amount.

We do not fix the amount for the reason that we are remanding the case for re-determination of Brown's claim.

Cause remanded for rehearing as indicated in the opinion.

HORNBECK, PJ., concurs.
GUERNSEY, J., dissents.

GUERNSEY, J., dissenting:
Guernsey, J., dissents on the ground that the finding and order of the Probate Court entered on the hearing of the schedule of debts constituted a final adjudication of the validity of the claims of Frederick W. Freeman and Grover C. Brown against the estate of Henry V. Butler, deceased, binding upon all persons interested in the estate, including those who filed exceptions to the account of Lewis C. Freeman, administrator with the will annexed of said estate; and consequently that the question of the validity of credits claimed by said administrator in his account for the payment of such claims the allowance of which by the administrator was affirmed in said order is not the subject of adjudication on exceptions to said account. The only remedy available to persons interested in said estate desiring to contest the validity of such claims is a direct attack on said finding and order affirming the allowance of the claims by the administrator, on the ground of fraud or collusion in the procurement of said finding and order to which proceeding said claimants, respectively, the resigned administrator and the successor administrator would be necessary parties defendant. If on such direct attack such order is opened up and the action of the administrator in allowing such claims reversed, the claims will stand as rejected and the claimants will be remitted to their remedies of actions at law to establish and enforce their respective claims, or if the Probate Court modifies the action of the administrator in allowing the claims, if the part allowed is severable from the part disallowed the claim will stand allowed as to the part allowed and disallowed as to the balance, and as to the balance the claimant will be remitted to his action at law; and in case the part disallowed is not severable the claimant may treat such partial disallowance as a rejection of the entire claim and sue for the entire amount. **Amrine v Gabriel**, Court of Appeals, Third Appellate District, decided April 15, 1939, reported in **14 OO 447**, issue of July 3, 1939. (29 Abs 161).

When the amounts of the respective claims against the estate have been finally determined in the manner hereinbefore mentiond, if the credits claimed by the administrator in his account for the payment thereof are in excess of such determined amounts the exceptions herein filed will lie to such excess.

In view of the evidence tending to prove fraud and collusion on the part of the administrator and claimants, referred to in the majority opinion, I am not of the opinion that this court is warranted in reversing the judgment appealed from and entering final judgment in favor of the administrator on the ground that exceptions do not lie to the administrator's account, but am of the opinion that this court should reverse the judgment of the Probate Court on this ground and remand the cause for a new trial and further proceedings according to law with instructions to the Probate Court to continue

the hearing of the exceptions to the account to such a time as will give the exceptors an opportunity to make a direct attack on said finding and order of the Probate Court entered on the hearing of the schedule of debts, and if attack is successful to give the claimants opportunity to resort to their respective actions at law to establish the validity and amounts of their respective claims.

I am further of the opinion that the judgments to be entered by this court as set forth in the majority opinion in this case on the question of the rights of persons interested in the estate of a decedent for a finding and order of the Probate Court affirming the allowance of claims against the estate to except to the credits claimed by the administrator in his account for the payment of claims the allowance of which was affirmed in said order, is in direct conflict with the judgment of the Court of Appeals of the Third Appellate District in the case above mentioned, and that this cause should for that reason be certified to the Supreme Court for final determination pursuant to the provisions of **Sec. 6, Art. IV of the Constitution.**

Except as hereinbefore specially mentioned, I concur in the majority opinion.